FILED

2008 May-27  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| Arvin D. Boyles, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 07-G-1247-NW |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The plaintiff, Arvin D. Boyles, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security Benefits.  Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES HE SUFFERS FROM DISABLING PAIN

In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms."  Foote, at 1560.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  In this circuit medical evidence of pain itself, or of its intensity, is not required.

2

> While both the regulations and the <u>Hand</u> standard require
> objective medical evidence of a condition that could reasonably be
> expected to cause the pain alleged, <u>neither requires objective proof of</u>
> <u>the pain itself</u>.  Thus under both the regulations and the first
> (objectively identifiable condition) and third (reasonably expected to
> cause pain alleged) parts of the <u>Hand</u> standard <u>a claimant who can</u>
> <u>show that his condition could reasonably be expected to give rise to the</u>
> <u>pain he alleges has established a claim of disability and is not required</u>
> <u>to produce additional, objective proof of the pain itself</u>.  <u>See</u> 20 CFR
> §§ 404.1529 and 416.929;  <u>Hale</u> at 1011.

<u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1215 (11th Cir.

1991)(parenthetical information omitted)(emphasis added).  Furthermore, it must be

kept in mind that "[a] claimant's subjective testimony supported by medical

evidence that satisfies the pain standard is itself sufficient to support a finding of

disability."  <u>Foote</u> at 1561.  Therefore, if a claimant testifies to disabling pain and

satisfies the three part pain standard, he must be found disabled unless that

testimony is properly discredited.

When the Commissioner fails to credit a claimant's pain testimony, he

must articulate reasons for that decision.

> It is established in this circuit that if the Secretary fails to articulate
> reasons for refusing to credit a claimant's subjective pain testimony,
> then the Secretary, as a matter of law, has accepted that testimony as
> true.  Implicit in this rule is the requirement that such articulation of
> reasons by the Secretary be supported by substantial evidence.

<u>Hale v. Bowen</u>, 831 F.2d 1007, 1012 (11th Cir. 1987).  Therefore, if the ALJ either

fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if

3

his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

## THE MEDICAL RECORDS

In the present case the plaintiff alleges he became disabled on November 9, 2001, due to back and leg pain. The medical records show the plaintiff has complained of back and leg pain since at least August of 2001. In November 2001, the plaintiff suffered an injury to his left knee when he stepped in a hole at his home. MRI scanning at that time showed mild arthritic changes in the lumbar spine. X-ray scans of the left knee from December , 2001, were unremarkable.

The plaintiff next complained of knee pain in August 2002. At this time x-rays were interpreted as showing osteoarthritis of the left knee. After August 2002, the plaintiff sought treatment for his knee and back pain in February 2003, when he saw Dr. Goodman. The plaintiff reported he had been doing okay, but continued to have pain, which had increased significantly in the previous two weeks. During February 2003, the plaintiff saw doctors on multiple occasions. At that time, bone scans showed degeneration in the left knee. CT imaging of the lumbar spine showed mild bulging at L4-5, and degenerative changes at L5-S1. There is a one year gap in the treatment records after February 2003.

4

In March 2004, the plaintiff returned to Dr. Goodman with complaints of pain in his knees, which had worsened over the previous two weeks.  He received an injection to his knee.  He returned to Dr. Goodman in December 2004.  He had pain in his posterior buttock with straight leg raise.  He was given another injection to his knee.

Beginning in March 2005, the plaintiff was seen on a much more frequent basis.  Dr. Goodman began a series of four Supartz[1] injections to his knee on March 14, 2005.  These injections did not give lasting relief.  On April 11, 2005, Dr. Howell noted that x-rays showed degenerative disc disease at L5-S1 and foraminal stenosis[2] at L4-5.  After injections did not relieve the plaintiff's pain, Dr. Howell ordered MRI scans.  The MRI scans showed mild disc bulging throughout the lumbar spine, with moderate facet degenerative changes at L4-5, but with no stenosis.  There was bilateral foraminal narrowing, however, at L4-5.  The plaintiff

---

[1] "Supartz is a solution of hyaluronate, a natural substance that acts like 'oil' to cushion and lubricate [the] knee joint."  http://www.orthopodsurgeon.com/supartz.html

[2] A foramen is a natural opening or passage especially one into or through a bone. Dorland's Illustrated Medical Dictionary 648 (28th Edition).  "Foraminal stenosis is tightening of the openings of the exit points for each nerve as it is exiting the spinal column."  Surgical Management of Spinal Stenosis, (Richard J. Bransford, M.D., ed.) viewed at: http://www.orthop.washington.edu/uw/laminectomy/tabID__3347/ItemID__283/PageID_ _2/Articles/Default.aspx

was prescribed a course of physical therapy.  However he was unable to complete

the therapy.  The therapist noted on May 26, 2005, the plaintiff had only completed

two sessions, which he did not tolerate well.  It was noted the plaintiff was guarded

with all exercises and activity.[3]  The therapist indicated motivation/compliance was

"poor."

        The plaintiff continued to seek treatment for his pain and saw both Dr.

Goodman and Dr. Howell in July 2005.  Dr. Howell noted the presence of muscle

spasm through the lumbar and thoracic paraspinals and subjective SLR signs in the

left foot, which was noted to be chronic for him.  He received a knee injection from

Dr. Goodman, who noted the plaintiff had been scheduled for total knee

replacement surgery the following week.  Dr. Howell prescribed facet injections.

On October 31, 2005, Dr. Howell noted the plaintiff had failed conservative

treatment, including epidural steroid injections and facet injections.  He was referred

to Dr. Melson to determine if he would benefit from spinal surgery.

        On November 4, 2005, Dr. Melson noted that studies showed mild

foraminal stenosis at L4-5, with one view suggesting a fairly significant central

stenosis.  He diagnosed multi-level degenerative disc disease and opined the

---

        [3]  Guarding is defined as the "involuntary reaction to protect an area of pain (as by
spasm of muscle on palpation of the abdomen over a painful lesion)."
http://medical.merriam-webster.com/medical/guarding

plaintiff might well have a spinal claudication.[4]  Nerve conduction studies were

ordered to determine the level of the radiculopathy.  These studies which were

negative.  Dr. Melson saw the plaintiff on November 22, 2005, and noted the

plaintiff's complaints did not describe intrinsic knee pain because the pain went

away upon sitting and returned after he stood for five minutes.  Dr. Melson believed

his leg and pain was probably due to stenosis at L4-5.  He suggested surgical

decompression as an option should the pain become intolerable.

On January 9, 2006, the plaintiff saw Dr. Goodman and requested a

knee injection.  It was noted the plaintiff's knee was still symptomatic and bothered

him on ambulation and activities.  On January 31, 2006, Dr. Goodman again noted

the plaintiff's knee was quite symptomatic.

On March 21, 2006, the plaintiff saw Dr. Melson, who noted that

epidural steroid injections had not helped.  The plaintiff still complained of a fair

amount of leg pain.  He told Dr. Melson he would like to get rid of the leg pain, and

---

[4] Spinal claudication is due to marked narrowing of the spinal canal with resulting
pressure on the cauda equina. The characteristic symptoms are variable discomfort in the
back and legs, brought on by exercise and/or extension movements of the hips and low
back. The neurological examination may be normal or may reveal dysfunction of one or
more lumbosacral nerve roots. Myelography and, particularly, body CT scanning are
definitive diagnostic procedures. Most patients respond satisfactorily to extensive surgical
decompression.

Can Fam Physician. 1983 February; 29: 325–328. available online at:
http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=2153774

was interested in spinal decompression surgery.  On March 28, 2006, Dr. Melson,

saw the plaintiff in follow-up of MRI scans.  Dr. Melson noted the plaintiff

continued to complain of a lot of leg pain and numbness when standing, which went

away upon sitting.  However, Dr. Melson did not see significant degenerative disc

disease on the MRI.  He also did not see significant stenosis or herniations.  Dr.

Melson's impression was as follows:

> I think that he is genuine.  I think his pain is probably a referred pain
> pattern.  If he had more degenerative disc disease, I would probably
> have attributed it to referred pain from a degenerative disc.  I really
> don't have a good etiology for his pain.  I do not see a surgical lesion.
> I suggested he follow-up with Dr. Howell for both pain management
> and further evaluation, possibly some selective blocks and nerve
> studies.  I will be happy to see him back if anything shows up further.

[R 137 (emphasis added).]

On May 4, 2006, Dr. Howell noted:  "We have done epidurals and

treatment.  Nothing has really helped his back pain."  [R 135]  On examination Dr.

Howell found tenderness in the lumbosacral junction and subjective left leg

radicular symptoms.  On May 25, 2006, Dr. Howell noted the results of recent CT

scan showed a spondylotic[5] defect at L5 bilaterally, but no spondylolisthesis.[6]  Dr.

_____

[5]  Spondylotic is defined as "pertaining to or due to spondylosis." Dorland's
Medical Dictionary for Health Consumers. © 2007 by Saunders, an imprint of Elsevier,
Inc. All rights reserved.  http://medical-dictionary.thefreedictionary.com/spondylotic

Spondylosis is defined as "ankylosis [imobility and consolidation of a joint due to disease,
(continued...)

Howell noted: "He takes occasional Lortab once a day.  Otherwise pretty well controlled.  He has had epidurals in the past that have given him a little relief temporarily."  [R 133]  Dr. Howell's plan was to send him to Birmingham for further evaluation.

The plaintiff was also sent to Dr. Gillis for a consultative examination on May 3, 2005.  Dr. Gillis noted the plaintiff "does have some difficulty getting on and off the exam table and difficulty with some of the maneuvers because of left knee stiffness and pain and due to having low back pain."  [R 110]  Dr. Gillis also noted the plaintiff was "only able to do a half squat due to left knee pain and stiffness."  [R 110]

## DISCUSSION

The court has carefully reviewed the record and finds that the decision of the ALJ must be reversed and the action remanded for further development of the record.  The ALJ  found the plaintiff had  the following residual functional capacity ("RFC"):

---

[5]  (...continued)
injury, or surgical procedure] of a vertebral joint; also, a general term for degenerative changes due to osteoarthritis."  Dorland's Illustrated Medical Dictionary 1567, 91 (27th Edition).

[6]  Spondylolisthesis is  defined as "forward displacement of one vertebra over another."  Dorland's Illustrated Medical Dictionary 1567 (27th Edition).

> [T]he claimant has the residual functional capacity to perform medium
> work with the following restrictions:  lifting up to 50 pounds
> occasionally and 25 pounds frequently, standing and/or walking six
> hours out of an 8-hour workday, sitting (with normal breaks) for six
> hours out of an 8-hour workday.  He has no difficulty with grip
> strength or use of his fingers.

[R 17]  The reasons recited by the ALJ to support this finding are not supported by

substantial evidence.  The medical records, summarized above, are not compatible

with the ability to perform medium work, at least during the latter part of the

relevant period.  It is simply not reasonable to find that an individual who is a

candidate for knee replacement is able to walk for six hours in an eight hour day.

The plaintiff's treating orthopod (who had recommended  that knee replacement be

delayed as long as possible because of the young age of the plaintiff) actually

scheduled the surgery.  It is not reasonable to believe such surgery would have been

considered had the plaintiff been able to walk for a total of six hours in an eight-

hour day.  The commissioner's own consultative physician noted the plaintiff had

difficulty  getting on and off the examination table, and with other maneuvers

during the examination, due to pain.

In summing up his reasons for refusing to credit the plaintiff's

allegations of disabling pain, the ALJ wrote the following:

> There is no muscle atrophy in his legs, which one would expect if the
> claimant had been experiencing a disabling level of pain since 2001,
> now almost five years.  There are significantly long gaps in his medical

treatment for someone alleging disabling pain and numbness.  He did
not follow through with physical therapy and even refused to return
telephone calls to reschedule.

[R 21]  There are problems with each of these three reasons.

None of the plaintiff's treating physicians commented on the lack of
muscle atrophy.  The ALJ is not a doctor and is not qualified to determine whether a
lack of atrophy in the plaintiff's legs precluded the presence of pain.  None of the
plaintiff's treating doctors ever questioned the plaintiff's complaints of pain.  To the
contrary, the records show the plaintiff's treating doctors administered multiple
epidural and facet joint injections in an attempt to alleviate the plaintiff's pain.
Likewise, multiple knee injections were performed.  His treating orthopod was
willing to perform total knee replacement surgery, which indicates he believed the
plaintiff's pain was real and severe enough to warrant such a major surgical
intervention.  The plaintiff was referred to Dr. Melson, who indicated the plaintiff's
pain was genuine.  Dr. Melson initially believed that surgical decompression of the
plaintiff's spine should be considered.  Although it is evident from the medical
records that the plaintiff's treating doctors have been unable to fully determine the
exact cause of the plaintiff's pain and other symptoms, none questioned their
presence.

It is correct, as the ALJ noted, that there are several long gaps in the plaintiff's treatment history.  Such gaps might provide support for the ALJ's decision prior to March 2005.  However, since March of 2005, the plaintiff has sought treatment virtually every month.  Beginning in March 2005, there are many months with multiple visits to multiple doctors, and there is no long gap in the treatment record.  Gaps in treatment in earlier years do not provide a basis for refusing to credit the plaintiff's complaints in later years.  A worsening of symptoms over time is to be expected with degenerative diseases.  It was improper to utilize gaps in treatment in earlier years to reject the plaintiff's complaints of pain and limitations in later years.

While it is true the plaintiff did not complete the physical therapy prescribed, as noted above, the therapist's notes indicate this was likely due to the presence of pain.  While the plaintiff's compliance might technically have been "poor," the ALJ should have further inquired as to the reasons for that noncompliance.

**CONCLUSION**

The ALJ's finding that the plaintiff could perform medium work is not supported by substantial evidence after March 2005.  It is questionable whether it is supported by substantial evidence prior to that time, but because the action must be

remanded, the court need not decide that issue.  Therefore, the ALJ's finding that the plaintiff could perform his past relevant work is not supported by substantial evidence and the action must be remanded for a proper RFC determination.  On remand the Commissioner shall properly determine the plaintiff's RFC during the relevant period.  Such RFC finding might yield a different RFC at different periods of time.  The Commissioner should consider whether a medical advisor is warranted in light of the complexity of the plaintiff's impairments and their variability over time.  If additional testing or consultative examinations are necessary, they should be ordered.

An appropriate order will be entered contemporaneously herewith.

DONE and ORDERED 27 May 2008.


_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.